IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

SHERISHA L. HATCHETT,
     Petitioner,

vs.                        Case No.: 3:17cv724/RV/EMT

DEPARTMENT OF CORRECTIONS,
     Respondent.
_____/

## REPORT AND RECOMMENDATION

    This cause is before the court on a petition for writ of habeas corpus filed by Petitioner under 28 U.S.C. § 2254 (ECF No. 1). Respondent filed a motion to dismiss the petition as procedurally defaulted, with relevant portions of the state court record (ECF No. 37). Petitioner responded in opposition to the motion to dismiss (ECF Nos. 39, 40).

    The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b). After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition

of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that Petitioner's habeas petition should be denied.[1]

## I.     BACKGROUND AND PROCEDURAL HISTORY

The procedural background of this case is established by the state court record.[2] Petitioner was charged in the Circuit Court in and for Escambia County, Florida, Case No. 2013-CF-005650, with one count of attempted kidnapping to inflict bodily harm or terrorize victim (Count 1), one count of carrying a concealed firearm (Count 2), and one count of carrying a concealed weapon (a knife) (Count 3) (Ex. B1 at 1).

On March 27, 2014, Petitioner was adjudicated incompetent to proceed to trial, and committed to the custody of the Florida Department of Children and Families in a mental health treatment facility (Ex. B1 at 22–25). Following competency proceedings on November 21, 2014, and January 29, 2015, the court found her competent to proceed to trial (Ex. B1 at 64; B3 at 410–50; Ex. B11 at 914–1001).

Petitioner proceeded to a jury trial on November 9, 10, and 12, 2015, at the conclusion of which the jury found Petitioner guilty as charged on all counts (Ex. B2

---

[1] When the court directed service of the habeas petition upon Respondent, the service order expressly stated that if Respondent presented a procedural default defense, the defense should be asserted in an answer, not a motion to dismiss (*see* ECF No. 15 at 2). Despite this directive, Respondent asserted its procedural default defense in a motion to dismiss.

[2] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's motion to dismiss (ECF No. 37). If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

at 292–93; Exs. B7 at 180–96, B8, B9, B10).   On January 29, 2016, the court

sentenced Petitioner to fifteen (15) years in prison on Count 1, with pre-sentence jail

credit of 804 days; a consecutive term of two (2) years in prison followed by three (3)

years of probation on Count 2; and time served on Count 3 (Ex. B3 at 357–72; B6 at

837–903).

Petitioner appealed the judgment to the Florida First District Court of Appeal,

Case No. 1D16-731 (Ex. B12).   The First DCA affirmed the judgment per curiam

without written opinion on May 17, 2017 (Ex. B16).   Hatchett v. State, 226 So. 3d 817

(Fla. 1st DCA 2017).   The mandate issued July 11, 2017 (Ex. B19).   Petitioner filed

a "Notice of Appeal," seeking review by the Supreme Court of Florida, Case No.

SC17-1059 (Ex. C1).   On July 13, 2017, the state supreme court dismissed the case

for lack of jurisdiction (Ex. C2).   On August 23, 2017, Petitioner filed a second

"Notice of Appeal" with the Supreme Count of Florida, Case No. SC17-1589 (Ex.

D1).   The state supreme court dismissed the case for lack of jurisdiction on August 29,

2017 (Ex. D2).

Petitioner filed the instant habeas petition on July 31, 2017 (ECF No. 1).

## II.    EXHAUSTION

It is a long-standing prerequisite to the filing of a federal habeas corpus petition

that the petitioner have exhausted available state court remedies, 28 U.S.C.

§ 2254(b)(1),[3] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" her claim in each appropriate state court, alerting that court to the federal nature of the claim.  Duncan, 513 U.S. at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.

---

[3] Section 2254 provides, in pertinent part:

(b)(1)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
    (A)  the applicant has exhausted the remedies available in the courts of the State; or
        (B) (i)  there is an absence of available State corrective process; or
            (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.*, 404 U.S. at 278, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court. In Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. *Id.* 459 U.S. at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)). The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." Anderson, 459 U.S. at 7. The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim. *Id.*, 459 U.S. at 7 and n.3. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the

federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  *Id.*

Years later, the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364.   The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[4]  The Supreme Court explained,"[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." Duncan, 513 U.S. at 365–66.

In Baldwin v. Reese, the Supreme Court again focused upon the requirement of "fair presentation," holding that  "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."  541 U.S. 27, 32, 124 S. Ct. 1347, 158 L. Ed. 2d 64 (2004).  The Baldwin Court commented that "a

---

[4] The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Id.*, 541 U.S. at 32. With regard to this statement, the Eleventh Circuit stated in McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion. However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'" McNair [v. Campbell], 315 F. Supp. 2d at 1184 (quoting Vasquez v. Hillery, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)). This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302–03 (citations omitted).[5]

---

[5] In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. *Id.*

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review. Bailey v. Nagle, 172 F.3d 1299, 1302-03 (11th Cir. 1999). To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim. Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), rev'd on other grounds, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991). "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)). To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." Schlup, 513 U.S. at 327. Further:

a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.*

## III.    DISCUSSION

A.    <u>Ground One: "Lack of jurisdiction of Florida since federal [sic], if being claimed [sic]. Violating due process."</u>

Petitioner claims she is a veteran who was residing in Petersburg, Virginia at the time of the conduct underlying the charges in this case (ECF No. 1 at 5).[6] Petitioner alleges she came to Florida for the sole purpose of meeting with her ex-husband's commanding officer to file a complaint against her ex-husband (*id.*).[7] Petitioner alleges she never made contact, or attempted to make contact, with her ex-husband (*id.*). Petitioner alleges she did not desire to make contact with her ex-husband, because he had a history of abusing her (*id.*). Petitioner alleges she was detained (and subsequently arrested) at the entry to the premises of the National Guard in Florida (*id.*). Petitioner challenges the jurisdiction of the state court to charge and

---

[6] When referring to the parties' filings, the court refers to the page numbers automatically assigned by the court's electronic filing system, rather than the page numbers of the original documents.

[7] Petitioner's ex-husband, John Andrew Lewis, Jr., was the victim of the attempted kidnapping count.

convict her, and she claims that only federal authorities had jurisdiction to do so (*id.*). Petitioner concedes she did not present this issue to the state courts on direct appeal or in a post-conviction motion (*id.* at 5–6). She alleges her appellate counsel failed to raise the issue (*id.*).

Respondent contends Petitioner failed to exhaust this claim because she failed to present it on direct appeal (ECF No. 37 at 5–6). Respondent contends it is too late for Petitioner to return to the First DCA to now attempt to exhaust her claim; therefore, it is procedurally defaulted for federal habeas purposes (*id.* at 5–6).

The problem with Respondent's procedural default argument is that even though a second direct appeal is not available to Petitioner, she could present her claim to the state courts in a Rule 3.850 motion. Rule 3.850 expressly provides that a defendant's challenge to the trial court's jurisdiction to enter judgment or impose sentence may be raised in a Rule 3.850 motion. *See* Fla. R. Crim. P. 3.850(a)(1)(2–3). Further, although Petitioner has not filed a Rule 3.850 motion, she still has time to do so. *See* Fla. R. Crim. P. 3.850(b) (providing that a Rule 3.850 motion generally must be filed no more than 2 years after the judgment and sentence become final).

Nevertheless, Petitioner is not entitled to federal habeas relief on Ground One because, notwithstanding the exhaustion issue, her federal due process claim is without merit. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas

corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  Petitioner argues the trial court lacked jurisdiction to try and sentence her, because the offense conduct occurred on the property of the Army National Guard Armory in Pensacola, Florida, which Petitioner alleges is federal property.

According to the trial testimony, David Marshall, a member of the Florida National Guard, was engaged in a training drill at the National Guard Armory on Grow Road in Pensacola, Florida, on November 17, 2013, when he saw Petitioner walking at the outer edge of the Armory parking lot (Ex. B8 at 200–05).  Marshall then saw Petitioner kneel between two vehicles in the Armory parking lot (*id.* at 205). Mr. Marshall testified that one of the vehicles belonged to John Lewis, Jr., another National Guardsman (*id.* at 205–06).  Mr. Marshall then saw Petitioner walk to her own vehicle, which was also in the Armory parking lot (*id.* at 206–07).  Marshall saw Petitioner drive her car out of the Armory parking lot to a commercial parking lot across the street (*id.* at 207).  Marshall and National Guardsman Gilton looked at John Lewis' car and saw what appeared to be a fresh scratch, but Marshall admitted he did not actually see Petitioner scratch the car (*id.* at 208–09).  Mr. Marshall testified that Guardsman Gilton summoned two other Guardsman, Perry Heslep (who was also a law enforcement officer) and Preston Cornett (*id.* at 208–09).  Heslep and Cornett

drove in Heslep's marked patrol car to Petitioner's car, while Guardsmen Marshall and Gilton walked there (*id.* at 209–10). Guardsman Marshall heard Heslep identify himself as a law enforcement officer, and he saw Petitioner exit her vehicle (*id.* at 210–11). Marshall then saw Petitioner attempt to re-enter her vehicle, but Heslep and Cornett attempted to stop her (*id.* at 211). Marshall observed the three struggle, and saw knives and handcuffs on the ground (*id.* at 211–12). Perry Heslep handcuffed Petitioner, and Marshall contacted the Escambia County Sheriff's Office (*id.* at 212–13).

Perry Heslep testified he was a lieutenant with the Shalimar Police Department and also a National Guardsman (Ex. B8 at 222–23). Heslep testified that on November 17, 2013, the Armory was at a heightened security threat level (*id.* at 327). Heslep testified that when he and Guardsman Cornett drove to Petitioner's car, Heslep parked his marked patrol car on Grow Road, partially in front of Petitioner's car (*id.* at 223). Heslep testified he activated his lights, because he was on the road with oncoming traffic (*id.*). Heslep testified Petitioner exited her car, smiled, and asked, "Is this about me parking over here?" (*id.* at 226). Heslep testified he told Petitioner he was a law enforcement officer, and the expression on Petitioner's face changed (*id.* at 226–27). Heslep testified Petitioner started running back to her car, and Heslep ran after her, because he saw a bulge underneath Petitioner's hoodie (*id.* at 227). Heslep

testified Petitioner had something in her hand, but he did not know what it was (*id.* at 227). He testified he grabbed her right arm and saw that the object was a phone (*id.* at 227–28). Heslep testified he took Petitioner to the ground, and Guardsman Cornett got on top of Petitioner (*id.* at 229–30). Heslep testified Cornett yelled, "Duty belt," and Heslep responded, "Search her" (*id.* at 230). Heslep testified Cornett found two knives, a stun gun, and two sets of handcuffs in Petitioner's belt (*id.* at 230). Heslep handcuffed Petitioner with one set of handcuffs from Petitioner's belt (*id.* at 231). Heslep asked Petitioner if she had any other weapons, and Petitioner responded she had a gun under her purse in the car (*id.* at 232). Heslep testified he lifted a purse in petitioner's car and saw a firearm loaded with an ammunition magazine (*id.* at 232–33).

Preston Cornett testified that on November 17, 2013, the Armory was on an "Alpha plus" threat level, which included conducting security sweeps through the parking lot, patrols of the Armory's perimeter, and identification checks of persons entering the Armory (Ex. B8 at 361). Cornett testified that a person acting suspiciously in the Armory's parking lot would have raised concern and been investigated (*id.* at 361–62). Cornett testified that Guardsmen Marshall and Giltinin (or Gilton) reported suspicious activity in the parking lot, so he (Cornett) and Perry Heslep investigated (*id.* at 362–63). Mr. Cornett testified he and Heslep got into

Heslep's patrol car and drove across the street to Petitioner's car (*id.* at 363). Cornett testified that Petitioner's car was in a commercial parking lot across the street from the Armory's parking lot (*id.* at 376). Cornett testified he and Heslep were wearing their military uniforms and identified themselves to Petitioner (*id.*). Cornett testified he and Heslep told Petitioner there had been suspicious activity in the parking lot of the Armory and a car with damage on it (*id.*). Cornett testified they told Petitioner that she was reported as the person seen in the parking lot acting suspiciously, and they wanted to find out who she was and why she was in the parking lot (*id.*). Mr. Cornett testified that Petitioner's demeanor was initially cordial, but when Heslep identified himself as a police officer, Petitioner attempted to get into her car, which was still running and had the driver's door open (*id.* at 364–65, 368–69). Cornett testified Heslep pushed the car door closed to prevent her from doing so (*id.*). Mr. Cornett testified that at one point, Petitioner reached into the car, and her hoodie lifted up, exposing a "duty belt" with handcuffs and a pocketknife (*id.* at 366–67). Cornett testified he told Heslep what he saw, and the two of them took Petitioner to the ground to maintain control of her and keep her out of the car (*id.* at 367, 369). Cornett testified at that point, he saw another pocketknife, another set of handcuffs, and a stun gun (*id.* at 367–68). Mr. Cornett testified that Petitioner stated John Lewis was

molesting their son, and she was there to see the commanding officer about it (*id.* at 380–81).

Jimmy Tatum, a investigator with the Escambia County Sheriff's Office, testified he responded to a dispatch to the Armory (Ex. B8 at 235–36). Investigator Tatum testified he assisted with handcuffing Petitioner (*id.* at 237). Tatum testified he also collected the firearm, stun gun, cell phone, and unused set of handcuffs, and transported the evidence to the Sheriff's Office (*id.* at 237–39, 253–54). Investigator Tatum testified he saw razor blades in the recess of the driver's door of Petitioner's car, and an open bag on the front passenger floorboard containing three canisters of pepper spray, several rolls of duct tape, gloves, and the firearm (*id.* at 259, 261, 263–64). Tatum testified he saw several pieces of duct tape that were torn in 12–18 inch lengths stuck to the front of the passenger seat (*id.* at 265–66). Investigator Tatum testified there was no room to accommodate a passenger in the front seat (*id.* at 264). Tatum testified there was no room for a passenger to sit in the back seat either, because items covered the floorboards, but a person could lie down across the back seat (*id.* at 265). Investigator Tatum testified he opened the trunk of Petitioner's car and saw plastic lining the entire trunk (*id.* at 262–63). Tatum testified a large area of the trunk was clear, and there was enough room to accommodate a person's body (*id.* at 263). Investigator Tatum testified that in the center console of Petitioner's vehicle,

he discovered a piece of paper with a detailed description of the victim's (John Lewis Jr.) vehicle (*id.* at 297–98).

Deputy Nick Duncan testified he responded to the National Guard Armory on Grow Drive in Pensacola, Florida on November 17, 2013 (Ex. B8 at 351–52).  When Deputy Duncan arrived, Petitioner was on the ground handcuffed with Officer Heslep and other Guardsmen standing around her (*id.* at 352).  Deputy Duncan testified he entered Petitioner's vehicle to ascertain her identity, because Petitioner stated she was an officer and that her credentials and gun were inside the vehicle (*id.*).  Deputy Duncan testified he saw a bag on the floorboard of the passenger's side, and Petitioner's purse was on top of that bag (*id.* at 354).  Duncan testified when he lifted Petitioner's purse to locate her identification, he saw a firearm on top of the bag (*id.*). Deputy Duncan testified he advised Petitioner of her <u>Miranda</u> rights and then asked her what she was doing at the Armory (*id.* at 355).  Deputy Duncan testified Petitioner stated she was there to meet with John Lewis and his commanding officer about the health and safety of her and Lewis' son (*id.*).  Deputy Duncan testified he placed Petitioner under arrest and transported her to the Escambia County Sheriff's Office (*id.* at 357).

John Lewis, Jr. testified he was a member of the Florida National Guard (Ex. B8 at 331–32).  He testified he and Petitioner were divorced in September of 2011,

which was two years prior to the events at the Armory on November 17, 2013 (*id.* at 334). Mr. Lewis testified he and Petitioner had one child together, of whom Lewis had custody (*id.* at 333–34). Mr. Lewis testified that ever since the divorce, Petitioner had accused him of sexually molesting their son (*id.* at 334, 337). Lewis testified that four different agencies had investigated Petitioner's allegations, and the agencies had determined that they were unfounded (*id.* at 334–35). Lewis testified that Petitioner also maintained a blog in which she posted sexual molestation allegations about him (*id.* at 335, 337). Mr. Lewis testified that Petitioner constantly called his employer and his neighbors and reported that Lewis was a child molester (*id.* at 337, 350). Lewis testified he was attending a drill at the National Guard Armory in Pensacola on November 27, 2013 (*id.* at 335–36). Lewis testified another Guardsman told him that someone had scratched his (Lewis') car, and that a female was outside (*id.* at 336). Mr. Lewis testified he walked outside and across the street, and he saw Petitioner handcuffed on the ground (*id.* at 336). Lewis testified that when he saw Petitioner, he became extremely upset and tried to run toward her, but another officer detained him (*id.* at 336–37). Mr. Lewis testified he had no knowledge that Petitioner would appear at the Armory that day (*id.* at 338–39). He testified that a week prior to that, he reported to police that his car had been scratched, and that he believed that a neighbor had done it (*id.* at 348–49).

Heath Jackson, a Sergeant with the Escambia County Sheriff's Department, testified he interviewed Petitioner at the Sheriff's Office on November 19, 2013 (Ex. B9 at 397–99). Sergeant Jackson testified that prior to the interview, he read Petitioner her <u>Miranda</u> rights and explained them to her (*id.* at 399). Jackson testified that Petitioner verbally indicated she understood her rights, and she signed a waiver of rights form (*id.* at 399–400). Sergeant Jackson testified he video-recorded the interview (*id.* at 400). The waiver form and the video recording were admitted into evidence (*id.* at 400–01). During the interview, Petitioner stated she did not go to the Armory to hurt anyone (*id.* at 404). Petitioner explained that the items in her car were for her own protection, because she anticipated John Lewis "was going to come get me" after she spoke with Lewis' commander about Lewis' sexual molestation of their son (*id.* at 404, 423). Petitioner told Sergeant Jackson that she spoke to the commander twice on the phone, but the commander told her he did not get involved in civil matters (*id.* at 423). Petitioner told Sergeant Jackson she thought the commander would listen to her if she showed up with certain paperwork (*id.*). Petitioner acknowledged she did not have an appointment with the commander (*id.* at 424). Petitioner said she went to the Armory parking lot to determine if John Lewis' car was there, and she saw that it was (*id.*). Petitioner stated she covered her face with a scarf because, "I always have my face covered up" (*id.*). Petitioner told

Sergeant Jackson she went back to her car to mentally prepare to speak with Lewis'

commander (*id.* at 425). Petitioner stated she brought the pepper spray, stun gun,

handcuffs, knives, and gun to protect herself in case Petitioner was at the Armory and

came after her (*id.* at 425–26). Petitioner stated she brought the duct tape so she could

conduct a citizen's arrest of Lewis if he tried to "get" her (*id.* at 427–28). Petitioner

stated she planned to transport Lewis to a police station in the State of Virginia and

have him charged as a pedophile (*id.* at 428–30). Petitioner explained to Sergeant

Jackson that she kept her trunk lined with plastic to transport trash, because there was

no garbage collection where she lived (*id.* at 430–31).

Lori Jordan testified she was a deputy clerk for the James City Circuit Court in

the State of Virginia (Ex. B9 at 437). Jordan testified she is an authorized custodian

of records for the State of Virginia's database of persons who are authorized to carry

concealed weapons (*id.* at 437–38). Ms. Jordan testified she searched the database to

determine if Petitioner had a permit to lawfully carry a concealed firearm, and

determined that Petitioner was not in the database (*id.* at 438–45).

Petitioner testified in her own defense (Ex. B9 at 474–508, 569–74). She

testified she and John Lewis were married in November of 2008, and divorced two

years later. She testified there was domestic violence during her two-year marriage

to John Lewis, specifically, that Lewis "wav[ed] his gun around" in the house (Lewis

was a sheriff's deputy).  Petitioner testified she Lewis also engaged in inappropriate sexual behavior with their infant son, and she reported the behavior to several law enforcement agencies, but none of them intervened.  Petitioner testified she left Lewis when they were living in Alabama.  She testified Lewis went to Florida for a two-week drill with the Florida National Guard, and she left their Alabama home with their son while Lewis was gone.  Petitioner testified that after she and John Lewis divorced, she was homeless and lived out of her car for an eight-month period in 2011.  She testified she kept razor blades, pepper spray, and tasers in her car for her safety. Petitioner testified she eventually moved to an apartment complex which did not have garbage collection services.  Petitioner testified she disposed of trash by loading it in her trunk and taking it to the dump.  Petitioner testified she purchased a new car in 2013, just three weeks prior to coming to Florida.  She testified she lined the trunk of the new car with plastic to protect it, because trash had leaked in the trunk of her old car.  Petitioner testified that in March of 2013, she called the Florida National Guard in Pensacola, Florida, and asked the date of their next drill.  Petitioner testified she was told that the next drill date was November 17, 2013.  Petitioner testified she asked to speak with John Lewis' commanding officer concerning "medical issues" with her and Lewis' son.

When asked why she drove the Florida National Guard on November 17, 2013,

Petitioner responded:

> Prior to me driving down here November 17, 2013, me and my ex-husband had no contact with each other for about, maybe, three to four years. I knew he was angry with me during the divorce, when a lot of his activities were being spoken of in the divorce court, and also, because of my son's website. He basically wanted me dead.

> And I needed a mediator between me and my ex-husband, so that he could not become violent with me. Because I was very afraid of him, and to this very day I am, and for very good reasons.

(Ex. B9 at 493). Petitioner testified she drove to the Armory and parked her car across

the street. She testified she walked to her ex-husband's car and verified the license

plate to determine that he was in the Armory. Petitioner testified she returned to her

car to gather her paperwork to speak with "anybody that had some type of authority."

Petitioner testified a police officer and a National Guardsman approached her car and

started questioning her. Petitioner testified she told the men that she was there to

speak with someone about her son being molested. Petitioner denied that she

identified herself as a police officer. Petitioner testified she told the men that they

could verify her identity by looking at the driver's license in her purse on the front

seat of the car. Petitioner admitted that she told the officer and Guardsman she had

a loaded gun in the front seat of her car. Petitioner also admitted she did not apply for

a permit to lawfully carry the gun. Petitioner denied that she intended to kidnap or

harm her ex-husband, and she denied that she planned to use any other weapons she brought to the Armory.

On cross-examination, Petitioner admitted that she lived in a subdivision of a suburban area within the city limits of Petersburg, Virginia (Ex. B9 at 510–65). Petitioner admitted she did not have a concealed weapons permit in Virginia, Florida, or Alabama. Petitioner testified she spent the night at a friend's house during the thirteen-hour trip from Virginia to Florida, and she told her friend that she had a gun, stun gun, handcuffs, and pepper spray in her car. Petitioner testified that all of the items in her car, including the strips of duct tape stuck to the dashboard, were for protection in case John Lewis attacked her. Petitioner admitted that there was a "privacy tent" underneath the plastic lining in her trunk, which was large enough to accommodate a person. Petitioner also admitted she told Sergeant Jackson (the deputy who interviewed her) that if John Lewis attacked her, she intended to make a "citizens arrest," handcuff him, pepper spray him, and drive him to the police.

Petitioner's due process challenge to her prosecution and conviction in state court is premised upon her assertion that the National Guard Armory and its parking lot are on federal land; therefore, the State of Florida had no jurisdiction to prosecute or convict her.

The United States Constitution created a federal system which allows for concurrent jurisdiction, in which both the national government and the states' governments maintain sovereignty over the same territory. *See, e.g.*, Printz v. United States, 521 U.S. 898, 918, 117 S. Ct. 2365, 138 L. Ed. 2d 914 (1997). States have the general authority to create laws to punish criminal offenses in their territory as part of their policing power. *See* United States v. Morrison, 529 U.S. 598, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000). However, the federal government still retained the authority to create and punish federal criminal offenses as "necessary and proper" to the execution of Congress's enumerated powers. *See* United States v. Comstock, 560 U.S. 126, 135–36, 130 S. Ct. 1949, 176 L. Ed. 2d 878 (2010); United States v. Worrall, 2 U.S. 384, 394 (1798). Therefore, a person in the United States is subject to the jurisdiction of both the federal government and the state government, where the individual is located. Likewise, an individual is subject to the criminal laws of both.

The National Guard is a state agency, under state authority and control, even though the activity, makeup, and function of the National Guard is provided for, to a large extent, by federal law. *See* Best v. Adjutant Gen. State of Fla., Dep't of Military Affairs, 400 F.3d 889, 891 (11th Cir. 2005) (citing N.J. Air Nat'l Guard v. FLRA, 677 F.2d 276, 279 (3d Cir. 1982)). Additionally, according to public records maintained by the Escambia County Property Appraiser, the property on which the National

Guard Armory on Grow Drive is located is owned by Escambia County, Florida. *See* Fed. R. Evid. 201(b–c) (providing that the court may take judicial notice, on its own, of a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned). There is no indication that the United States owned or accepted exclusive jurisdiction of the National Guard Armory on Grow Drive.

Regardless of whether Petitioner was in the Armory's parking lot or across the street when she committed the conduct underlying the charges of attempted kidnapping and carrying a concealed firearm and knife, she has failed to show she was on land over which the federal government had exclusive jurisdiction. Therefore, Petitioner's federal due process challenge to the state court judgment on jurisdictional grounds is without merit, and she is not entitled to federal habeas relief on Ground One.

    B.    <u>Ground Two: "Lack of evidence or insufficient evidence to convict on attempted kidnapping. Violating due process."</u>

Petitioner alleges law enforcement officers speculated with regard to the reason she was on the National Guard premises (ECF No. 1 at 7). Petitioner alleges, "No plan was expressed, written, or proven to exist involving the desire to kidnap any person or claimed target" (*id.*). She alleges she did not make any attempt to locate or

contact her ex-husband, nor did she initiate contact or have contact with him (*id.*). Petitioner alleges she did not attempt to confine, abduct, or imprison him (*id.*). She alleges her ex-husband "was in an unknown location and on a secure premises" (*id.*). Petitioner states she presented this challenge to the sufficiency of the evidence on direct appeal (*id.*).

Respondent argues that although Petitioner presented a challenge to the sufficiency of the evidence on direct appeal, she did not present it as a federal constitutional claim (ECF No. 37 at 6). Instead, Petitioner presented the claim to the First DCA as a state law claim without any reference to federal constitutional grounds (*id.*). Respondent argues Petitioner thus failed to satisfy the "fair presentation" element of the exhaustion requirement (*id.* at 6–7). Respondent contends Petitioner is now procedurally barred from presenting the claim to the state courts; therefore, it is procedurally defaulted for federal habeas purposes (*id.* at 8).

Petitioner argues she satisfied the exhaustion requirement (*see* ECF No. 39). Petitioner alternatively argues that any failure to exhaust was caused by ineffective assistance of appellate counsel (*see* ECF Nos. 39, 40). She additionally argues she is entitled to review of her claim under to the fundamental miscarriage of justice exception, because she is actually innocent of the attempted kidnapping charge (*see id.*).

The state court record demonstrates that in Petitioner's brief on direct appeal, Petitioner's counsel argued that the trial court erred in denying Petitioner motion for judgment of acquittal, because the evidence was insufficient to establish the overt act and intent elements of attempted kidnapping under Florida law (Ex. B12 at 77–87). Counsel argued that the State's evidence was entirely circumstantial, and that Petitioner had presented a reasonable hypothesis of innocence (*id.*). Counsel contended the State failed to present competent, substantial evidence inconsistent with Petitioner's theory of innocence, as required under Florida law (*id.*). Therefore, Petitioner's conviction should be reversed (*id.*).

Petitioner's initial brief asserted only a state sufficiency of the evidence claim, and relied on Florida's heightened burden of proof in cases involving circumstantial evidence. Notably, Petitioner's brief did not cite the Due Process Clause of the Fourteenth Amendment or any other federal constitutional provisions, nor did it cite any federal cases, let alone Jackson v. Virginia 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), which sets forth the federal standard governing sufficiency of the evidence claims. Petitioner's argument on this issue did not refer to federal law in any way, or even  mention the word "federal."  Nothing in her initial brief put the First DCA on notice that the challenge to the sufficiency of the evidence was being presented as a federal constitutional claim.  Further, the legal standard upon which

Petitioner relief in her initial brief is specific to Florida law. The federal sufficiency of the evidence standard, set forth in <u>Jackson</u>, does not include a requirement that the evidence exclude every reasonable hypothesis of innocence.[8] *See* <u>United States v. Herrera</u>, 931 F.2d 761, 763 (11th Cir. 1991) (evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt) (citations omitted). Because Petitioner

---

[8] Even if Petitioner had not relied upon Florida's special circumstantial evidence standard, and she had simply challenged the sufficiency of the evidence under the standard applied in non-circumstantial cases, which is the same as the federal standard, her argument would still have been insufficient to alert the state court to a federal claim, in light of her failure to reference the federal Constitution or any federal law, and her failure to cite any state cases relying on federal law. *See, e.g.*, <u>Ramos v. Sec'y, Dep't of Corr.</u>, 441 F. App'x 689 (11th Cir. 2011) (unpublished but recognized as persuasive authority) (petitioner's federal sufficiency of evidence claim was not exhausted where petitioner made only passing reference to federal constitutional right to due process in arguing that trial court improperly denied motion for judgment of acquittal because State failed to sufficiently prove premeditation element of murder); <u>Pearson v. Sec'y, Dep't of Corr.</u>, 273 F. App'x 847, 850 (11th Cir. 2008) (petitioner's federal sufficiency of evidence claim was not exhausted where petitioner cited exclusively to Florida cases in state court and addressed Florida law in all of his substantive arguments, even though Florida courts assess sufficiency of evidence under standard identical to federal standard); <u>Cook v. McNeil</u>, 266 F. App'x 843, 845–46 (11th Cir. 2008) (petitioner did not alert the state court to the alleged federal nature of his sufficiency of the evidence claim and therefore failed to exhaust his federal due process claim; even though petitioner moved for judgment of acquittal and although Florida courts assess the sufficiency of the evidence under the standard applied in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979), petitioner cited exclusively to the state cases and all of his substantive arguments addressed Florida law; "the tenor of [petitioner's] narrow arguments that challenged the characterization of his knife and the sequence of his actions under the Florida statute did not bring a federal claim about due process to the attention of the state appellate court."). *But see* <u>Mulinix v. Sec'y for Dep't of Corr.</u>, 254 F. App'x 763 (11th Cir. 2007) (petitioner's federal sufficiency of evidence claim was exhausted where petitioner presented identical argument to state and federal courts, and Florida courts' sufficiency of evidence standard was identical to federal standard).

did not make the state court aware that her claim included a federal constitutional claim, she did not fairly present her federal due process claim to the Florida courts.

Any further attempt at exhaustion in the state courts would be futile, because Petitioner's claim would be procedurally barred under Florida law. *See* Rodriquez v. State, 919 So. 2d 1252, 1262 n.7 (Fla. 2005) (holding that issues were procedurally barred because they should have been, but were not, raised on direct appeal); Smith v. State, 445 So. 2d 323, 325 (Fla. 1983) ("Issues which either were or could have been litigated at trial and upon direct appeal are not cognizable through collateral attack."). Therefore, Petitioner's federal challenge to the sufficiency of the evidence is procedurally defaulted from federal review.

As previously discussed, to overcome a procedural default such that this court may consider the merits of Ground Two, Petitioner must show cause for the default and prejudice resulting therefrom, or a fundamental miscarriage of justice. Tower, 7 F.3d at 210; Parker, 876 F.2d 1470. Petitioner asserts ineffective assistance of appellate counsel as cause for the procedural default. Although ineffective assistance of counsel which rises to the level of a constitutional deprivation may serve as cause for purposes of a procedural default analysis, the issue of ineffective assistance must first be presented as an independent state claim and exhausted in the state courts. Murray, 477 U.S. at 488; Orazio v. Dugger, 876 F.2d 1508 (11th Cir. 1989). In

Florida, a claim of ineffective assistance of appellate counsel is actionable in a petition for writ of habeas corpus filed in the appellate court to which the appeal was taken. *See* Fla. R. App. P. 9.141(d); <u>Davis v. State</u>, 875 So. 2d 359, 372 (Fla. 2003).  Here, Petitioner did not present a claim of ineffective assistance of appellate counsel to the First DCA.  Therefore, any such claim could not serve as cause for the procedural default.

Additionally, Petitioner has not shown she is entitled to review of his claim through the "fundamental miscarriage of justice" exception to the procedural bar.  She has not identified any new, reliable evidence, let alone shown that no reasonable juror would have convicted her if such evidence had been presented at her trial.  Therefore, she is not entitled to federal review of Ground Two through this exception.

Moreover, upon review of Petitioner's sufficiency of the evidence claim under the federal standard, Petitioner is not entitled to relief.  When reviewing a claim of insufficient evidence in federal habeas corpus, the proper inquiry is not whether the reviewing court itself believes that the evidence established guilt beyond a reasonable doubt but "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Jackson</u>, 443 U.S. at 319 (citation omitted); *see also* <u>Conklin v. Schofield</u>, 366 F.3d 1191, 1200 (11th Cir. 2004).  The evidence need

not rule out every theory except that which signifies guilt beyond a reasonable doubt; "[t]he simple fact that the evidence gives some support to the defendant's theory of innocence does not warrant the grant of habeas relief." Wilcox v. Ford, 813 F.2d 1140, 1143 (11th Cir. 1987). Moreover, because jurors are free to evaluate the credibility of testimony and the weight of the evidence, the court should assume that all conflicting inferences were resolved against the defendant. Wilcox, 813 F.2d at 1143. "It is only where, after viewing the evidence in its most favorable light and making all credibility decisions in favor of the state the evidence still fails to at least preponderate in favor of the state, that we become concerned with conflicting inferences." Cosby v. Jones, 682 F.2d 1373, 1383 (11th Cir. 1982).

As previously discussed, under Florida law, where a conviction was brought about solely through circumstantial evidence, the State must meet a stricter burden of proof, that the evidence presented be inconsistent with any reasonable hypothesis of innocence; however, this standard of proof is inapplicable for federal habeas review of a claim of insufficiency of the evidence. Federal constitutional analysis under Jackson is all that is required. Bishop v. Kelso, 914 F.2d 1468, 1472–73 (11th Cir. 1990); Wilcox, 813 F.2d at 1145 & n.7.

At Petitioner's trial, the court instructed the jury that to prove the crime of attempted kidnapping, the State must prove the following three elements beyond a

reasonable doubt:  (1) Sherisha Lashelle Hatchett attempted to forcibly abduct or imprison John Lewis, Jr. against his will; (2) Sherisha Lashelle Hatchett had no lawful authority to do so; and (3) Sherisha Lashelle Hatchett acted with intent to inflict bodily harm upon or to terrorize John Lewis, Jr. or another person (*see* Ex. B12 at 705–06).  The court further instructed the jury that in order to prove that Petitioner attempted to commit the crime of kidnapping, the State must prove the following beyond a reasonable doubt:  (1) Sherisha Lashelle Hatchett did some act towards committing the crime of kidnapping that went beyond just thinking or talking about it; and (2) she would have committed the crime except that someone prevented her from committing the crime of kidnapping (*id.* at 706).

Upon viewing the evidence presented at Petitioner's trial in the light most favorable to the prosecution, the relevant portions of which are summarized *supra*, the undersigned concludes that any rational trier of fact could have found the essential elements of attempted kidnapping beyond a reasonable doubt.  Therefore, Petitioner's federal challenge to the sufficient of the evidence is without merit, and she is not entitled to federal habeas relief on Ground Two.

## IV.   CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  If a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting § 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'"  Buck v. Davis, — U.S. —, 137 S. Ct. 759, 773 (2017) (quoting Miller-El, 537 U.S. at 327).  Here, Petitioner cannot make that showing.  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should

issue." Thus, if there is an objection to this recommendation by either party, that party

may bring this argument to the attention of the district judge in the objections

permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That Petitioner's § 2254 petition (ECF No. 1) be **DENIED**.

2.    That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this <u>13</u><sup>th</sup> day of December 2018.


*/s/ Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**